IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **JASON CLEM,** | ) | Civil Action No. 7:13-cv-00093 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD C. CLARKE, et al.,** | ) | By:   Hon. Michael F. Urbanski |
| Defendants. | ) |        United States District Judge |

Jason Clem, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1331 and § 1343. Clem names as defendants Harold C. Clarke, the Director for the Virginia Department of Corrections ("VDOC"), and A. David Robinson, the VDOC's Chief of Corrections Operations. Clem sues defendants to challenge the constitutionality of VDOC Operating Procedure 802.1 ("OP"), which inter alia, limits the number of publications an inmate may possess. After reviewing the record, the court grants defendants' motion for summary judgment because the OP is reasonably related to legitimate penological interests.

I.

The OP outlines the procedures and requirements for inmates to possess various types of property.[1] The OP requires that personal property, including publications, "be stored and secured in a locker, cabinet, or other facility supplied container so that it will not interfere with sanitation, insect and rodent control, and will not violate fire or other safety regulations." OP § IV.C.1. Unless otherwise regulated by a facility, a male inmate in general population, like Clem, may not possess more than twelve magazines, catalogs, or other periodicals, thirteen

---

[1] The OP was amended on August 1, 2012, soon after Clem was transferred from the Augusta Correctional Center ("ACC") to the Keen Mountain Correctional Center ("KMCC"), but the amendment did not change the numerical limits challenged in this action.

books, and one newspaper.  Although newspapers may not be accumulated, an inmate may possess as many newspaper and magazine clippings as can be stored in his locker or cabinet.[2]

While incarcerated at the ACC in 2012, Clem possessed thirteen books when he ordered four more books from a vendor.  Before he could accept the four new books, the OP required him to relinquish possession of four books to remain below the OP's limit.[3]  Clem also ordered a new book while at KMCC on July 31, 2012, but the OP prohibited Clem from receiving it unless he possessed only twelve other books.  Clem alleges that he wants to order a daily newspaper but finds the current limit of one newspaper too restrictive to commit to subscribing, despite the fact that none of his listed property includes a newspaper.  Compl. ¶ 16; Pl.'s First Resp. in Opp. to Summ. J., Ex. A, Dkt. # 40-1.

Clem admits to violating the OP in March 2013 when he possessed thirteen books and twenty-six magazines and catalogs at the time he instituted this action.  Notably, Clem explains that his thirteen books and twenty-six magazines and catalogs, which consist of "thousands of pages," do not fill up a quarter of his assigned storage containers.  Compl. ¶¶ 17-18.  Clem also admits to violating the OP in September 2013 when he possessed nineteen books and more than thirty magazines, periodicals, and catalogs.[4]

---

[2] Although an inmate may collect newspaper and magazine clippings, the newspaper or magazine from which something is cut out becomes contraband and must be immediately discarded.  OP § VII.O., attch. 3A, § 5.0.

[3] Attachments to the Complaint indicate that Clem left the four books for a friend or relative to retrieve.  The OP allows inmates to dispose of excess property by mailing it out of the facility, allowing a visitor to retrieve it, donating it to charity, or discarding it as garbage.  OP § VII.D.

[4] Of the nineteen books, Clem claims that six books are from the KMCC library and his housing pod.  Inmates are allowed to temporarily possess up to four library books and three pod books while possessing the maximum thirteen personal books.  Pl.'s Third Resp. in Opp. to Summ. J., Dkt. # 41-1, at 8-9, ¶ 9.  However, inmates may not borrow magazines or newspapers from the library.  Pl.'s Second Resp. in Opp. to Summ. J., Ex. A, Dkt. # 40-3, at 8, ¶ 9.  Also, Clem alleges that he has experienced two cell searches since March 2013 while possessing excessive publications and that correctional officers recognized that Clem possessed excessive publications but did not require him to dispose of excessive publications.  Pl.'s First Resp. in Opp. to Summ. J., Dkt. # 40, at 5.

Clem argues that the OP violates the First Amendment because the limits of twelve magazines, catalogs, or other periodicals, thirteen books, and one newspaper lack adequate penological justification. Clem demands damages against defendants because they allegedly promulgated, implemented, and enforced the applicable OP and also demands an injunction and declaration that he should be allowed to possess an unlimited number of publications as long as they fit neatly in his assigned storage containers.

II.

Clem is not entitled to his requested relief because the OP is reasonably related to legitimate penological interests. Clem "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). "[T]he fact that such detention interferes with the . . . understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into [unlawful] 'punishment.'" Bell v. Wolfish, 441 U.S. 520, 537 (1979). Thus, "a prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably related to legitimate penological interests.'" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right … remain open to prison inmates," . . .; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy

3

>     alternatives" to the challenged regulation or action, which may suggest
>     that it is "not reasonable, but is [instead] an exaggerated response to
>     prison concerns.

Id. at 200 (citing Turner, 482 U.S. at 89-92); see Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (recognizing the prisoner has the burden to disprove the validity of a prison regulation pursuant to the Turner analysis). Notably, federal courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132; see, e.g., Bell, 441 U.S. at 547.

In support of the OP, Robinson avers that:

> The number of publications an offender may possess was implemented by the VDOC as it is a good fit for all types of storage that are available and are based on average sizes. Limitation on these publications occurs for sanitation reasons, fire prevention, storage space issues, security issues, ability to conduct searches, and to ensure that staff can enter the offender's living area for emergencies. Even neatly stored items can present a safety and sanitation issue based on flammability, age, and proximity to other items that could soil or ignite the publications. Furthermore, publications in excess of the number permitted for an offender to possess presents security concerns such as offenders concealing contraband. Knives, shanks, and other forms of contraband are more easily stored in books and magazines. Search requirements for books, magazines, and newspapers requirements are time consuming. Limiting the number of these publications allowed in an offender's cell ensures that searches are manageable with existing prison staff.

Robinson Aff. ¶ 5. Robinson also explains that prisoners, like Clem, have access to books, magazines, and newspapers in an institutional library. Id. ¶ 6.

After reviewing the record and the Turner factors, the court concludes that Clem fails to disprove the reasonable validity of the OP's limit of twelve magazines, catalogs, or other periodicals, thirteen books, and one newspaper. Fire prevention, security, and sanitation are

4

legitimate and neutral governmental objectives, and the OP is rationally related to these valid objectives. Clearly, Clem has means of exercising the right to read publications; he may possess a broad range of books, magazines, catalogs, and newspapers by virtue of the OP, and, moreover, he usually has access to free books in facility and pod libraries.[5] Once he has read a publication, Clem can donate it, discard it, or mail it to someone and receive another publication within the OP's limits. The fact that Clem is limited to one newspaper and twelve magazines is not significant when he can possess as many newspaper and magazine clippings as can fit in his storage container.

Clem's proposed "obvious alternative" is to allow inmates to keep an unlimited number of periodicals, books, and newspapers as long as all the items fit in their storage containers. However, this alternative would unduly impact the allocation of prison resources by imposing more than a de minimis burden to valid penological goals. See Overton, 539 U.S. at 136 (recognizing that a prisoner's obvious regulatory alternative should not imposing more than a de minimis cost to the valid penological goal); Thornburgh v. Abbott, 490 U.S. 401, 418 (1989) (recognizing administrative inconvenience is an appropriate inquiry under Turner). The change would not be limited to just Clem's possessions but would allow all other general population inmates to possess as many publications that can possibly fit in their storage containers, dramatically increasing the fire load in all living areas. For example, Clem allegedly has "thousands of pages" of publications in just a quarter of his storage space, and, under Clem's proposal, the quantity of flammable publications would quadruple. This quantity of flammable materials would then double to account for the cellmate's permissible collection. This potential

---

[5] The KMCC library has been closed for months during this litigation due to a job vacancy for a KMCC librarian.

energy is magnified to, what prison officials have determined to be, an unacceptable level of risk to institutional safety when inmates may keep extra "thousands of pages" of publications in excess of the current limits.[6] See In re: Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ("Prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" (quoting Bell, 441 U.S. at 547)).

      Clem argues that the limits are unreasonable "[b]ecause cells are filled with an abundance of other flammable material." Clem does not recognize that many of those flammable items must be allowed to inmates, such as clothes, mattresses, linens, legal materials, and religious items like books or rugs. See, e.g., 42 U.S.C. § 2000cc, et seq. (providing greater protection for inmates' religious beliefs than the First Amendment); Farmer v. Brennan, 511 U.S. 825 (1994) (requiring prison officials to provide inmates the "minimal civilized measure of life's necessities"); Bounds v. Smith, 430 U.S. 817, 838 (1977) (requiring prison officials to facilitate inmates' access to courts). Defendants cannot forego issuing flammable mattresses, pillows, and blankets to inmates in general population, but they can limit the number of flammable periodicals, books, and newspapers in living areas. Clem's argument that prison officials should allow even more flammable materials in living areas because they must allow some flammable materials is reckless, unreasonable, and ignores the deference accorded to prison officials in maintaining a secure facility.

---

[6] Clem argues that a storage container full of newspaper and magazine clippings is more flammable and more of a threat than a storage container full of books. Anyone who has started a fire with scraps of newspaper can understand the quality of a fire once the clippings have promptly burned up. However, the energy in multiple "thousands of pages" of publications smoldering in a cell posses an exponentially greater risk to institutional safety and security.

Clem complains that Robinson over estimates the burdens of searching publications for contraband. It is clear to the court that having prison staff adequately searching each inmate's multiple "thousands of pages" of publications for secreted contraband poses a significantly greater and unnecessary challenge than searching each inmate's innumerable clippings, twelve periodicals, thirteen books, and one newspaper. Clem also argues that it is easier to hide contraband in other possessions, like clothing, photo albums, and food, and thus no numerical limit should be placed on publications. However, Clem fails to recognize that the OP similarly limits the quantities of many of the items in which contraband is allegedly routinely hidden. See OP, attch. 2, Dkt. #22-3, at 20-26 (limiting the possession of, inter alia, specific types of clothing, two photo frames, and one photo album).

Clem argues that publications do not inherently pose a health risk, publications are not inherently dirty, and "neatly stored publications do not significantly affect sanitation[.]" Pl.'s First Resp. in Opp. to Summ. J., Dkt. # 40-1, at 4. A prison has a legitimate penological interest in keeping its facilities clean, orderly and subject to ready inspection. A reasonable limitation on the number of books and magazines an inmate can possess at any one time is rationally related to this interest as it will prevent inmates from hoarding such materials. Allowing an inmate to fill his storage area to the brim with books and publications as Clem suggests presents obvious fire and security concerns and can impact sanitation by making cleaning more difficult and providing a nesting area for vermin. Plainly, courts are required to accord deference to prison officials dealing with health and sanitation issues affecting large populations of inmates living in close quarters.

Clem essentially argues that he is a responsible inmate who neatly organizes his library with due care to preserve his publications. Even if Clem is an exceptional inmate, prison officials must promulgate regulations that apply to inmates who may not be as good intentioned and as diligent in their literary preservation as Clem. To that end, the court finds none of Clem's arguments persuasive and concludes that the OP reasonably limits the number of publications possessed by inmates to promote fire prevention, security, and sanitation. Accordingly, defendants are entitled to summary judgment.[7]

### III.

For the foregoing reasons, the court grants defendants' motion for summary judgment.

Entered: March 13, 2014

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

---

[7] The court further notes that, even if the OP was not reasonably related to legitimate penological interests, Clem could not recover damages from defendants. Defendants enjoy absolute immunity from damages in their official capacities pursuant to the Eleventh Amendment of the United States Constitution. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Defendants also enjoy qualified immunity from damages in their individual capacities. See Pearson v. Callahan, 555 U.S. 223, 232 (2009) (stating qualified immunity permitted if, inter alia, the constitutional right at issue was not clearly established at the time of the alleged violation). None of the cases Clem cites supports his argument that defendants violated clearly-established law. First, the law that must be "clearly established" refers to decisions of the Supreme Court of the United States, the Court of Appeals for the Fourth Circuit, and the highest court of the state in which the case arose, Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999), and Clem does not describe any relevant law from these courts. Second, none of the cases supports his argument that defendants should have known that the numerical limits for possessing publications violated the First Amendment. All but one of the cases discuss the wholesale ban of inmates' receipt of publications, not about policies limiting the quantity of publications possessed, and the one other case discusses the relationship between publication limits, RLUIPA, and religious practice, which are not applicable to this action.